## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIP STULL, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>-against-<br><br>EMC CORPORATION, DELL, INC., SILVER LAKE PARTNERS, LLC, MSD PARTNERS, LLC, DENALI HOLDING INC., UNIVERSAL ACQUISITION CO., JOSEPH M. TUCCI, JOSE E. ALMEIDA, MICHAEL BROWN, DONALD J. CARTY, RANDOLPH L. COWEN, JAMES S. DISTASIO, JOHN R. EGAN, WILLIAM D. GREEN, EDMUND F. KELLY, JAMI MISCIK, PAUL SAGAN, and LAURA J. SEN,<br><br>                Defendants. | Civil Action No. 1:15-cv-13692<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, Philip Stull ("Plaintiff"), by and through his undersigned counsel, upon knowledge as to himself and upon information and belief as to all other matters, including the extensive investigation of his counsel, alleges as follows:

### NATURE OF ACTION

1.      This is a federal class action  based upon diversity, pursuant to 28 U.S.C. § 1332(a) on behalf all stockholder (the "Class") of EMC Corporation ("EMC"  or the "Company") who have been or will be damaged by the acquisition of EMC by Dell, Inc. ("Dell"), and its acquisition partners, Silver Lake Partners, LLC ("Silver Lake"), and MSD Partners, LLC ("MSD", together with Silver Lake and Dell, the "Acquirers"), as a

consequence of the Individual Defendants' (defined below") breaches of their fiduciary duties.

2.      On about October 12, 2015, EMC announced that it had entered into an Agreement and Plan of Merger ("Merger Agreement") in which Dell, and its owners, Michael S. Dell ("M. Dell"), MSD, and Silver Lake, through acquisition entities Denali Holding, Inc. ("Denali") and Universal Acquisition Co. ("Universal") will acquire all the outstanding shares of EMC for total consideration purportedly worth approximately $33.15 per share, representing a premium of 19% over the unaffected trading price of EMC shares prior to the announcement of the (the "Proposed Transaction") Proposed Transaction.

3.      The Proposed Transaction is the product of an unfair and flawed process, and does not offer Class members sufficient or adequate consideration.

4.      The transaction consideration ("Transaction Consideration") consists of $24.05 per share in cash, and approximately 0.111 of a share of "tracking stock" to be issued by a newly established entity, which will hold a portion of EMC's economic interest in the publicly traded company, VMware, Inc. ("VMware"), EMC's "crown jewel", for a total transaction value of $67 million.

5.      By way of the Proposed Transaction, EMC shareholders and Class members will receive tracking shares to EMC (with Dell keeping the remaining 28% of EMC's 81% interest in VMware), that will be freely tradeable and, once traded, will result in significant dilution of the value of VMware shares, and downward pressure on its stock price—which will depress the value of the consideration to be received by EMC shareholders.

6.     The Acquisition Consideration was based upon a price for VMware of $72.27 per share.  Since the announcement of the Proposed Transaction, however, the market value of VMware has declined about 15%, eliminating more than $5 billion in market value, in part because of the concern that the tracking stock, which will be tradable, will dilute VMware shareholders and result in downward pressure on the price of the stock.  Because the tracking stock will be freely tradeable, once it is issued, it will put further downward pressure on the price of VMware, further decreasing the consideration provided to Class members, particularly since the Board failed to negotiate a floor or at least a range of VMware shares, which would be issued to Class members in the event the price of VMware declined—which it has.

7.     The tracking stock, moreover, will not have voting rights, and Dell will retain control over the company although it will have only a 28% interest in the company. Moreover, historically tracking stock trades below the market price of the stock which it tracks, and in the event of liquidation, EMC shareholder will not have a legal claim on the company's assets, making their receipt of tracking stock even more risky.

8.     On the other hand, the use of tracking stock, rather than Dell's buy out of all of EMC's interest in VMware, is a benefit to Dell, which did not have to raise additional money in order to buy out EMC's large stake in VMware.

9.     Even aside from the issuance of tracking stock, the Merger Consideration is less than the consideration that could have been obtained in a break- up of the Company. Indeed, according to an analyst at FBR & Company, "many EMC shareholders will likely

argue breakup value is in the $35-38/share range and we strongly agree."[1]  As one analyst summed the Proposed Transaction:  "I think it's a great deal for Dell.  I think it's a terrible deal for shareholders, consumers and Boston."

10.    According to other analyses, the Merger Consideration offers a much lower multiple of EBITDA than that offered by precedent transactions including acquisitions made by EMC.[2]

11.    The Proposed Transaction was also the product of a flawed process in which EMC was not shopped prior to entering into the Merger Agreement, and was structured to both preserve the "federation" of companies operating under the EMC umbrella, and to assuage Dell's inability to raise sufficient cash to buy out the entire Company by offering risky tracking stock.

12.    By way of the Proposed Transaction, Joseph M.  Tucci ("Tucci"), EMC's chairman and chief executive officer, will obtain remuneration of over $27 million, avoid retiring and preserve his "federation" of companies under the EMC umbrella, rather than breaking up the Company as had been advocated earlier by activist shareholders, including Elliot Management Co. ("Elliot Management").

13.    It also involves a two tiered break up fee, which was designed to and will discourage EMC from seeking a superior offer.

14.    Plaintiff, on behalf of himself, and the Class, thus seeks to enjoin the consummation of the Proposed Transaction, so that the Individual Defendants' breaches of

---

[1] *See* http://fortune.com/2015/10/12/analysts-dell-emc-acquisition/
[2] *See* http://marketrealist.com/2015/10/dell-buying-emc-blockbuster-tech-deal

fiduciary duty can be remedied, and the Company's shareholders can avoid the irreparable harm.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $ 75,000, exclusive of interests and costs.

16.    This Court has jurisdiction over Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District (including the Proposed Transaction), or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a) as this the place where many of the Individual Defendants reside, and where EMC maintains one of its principal places of business.  Moreover, a substantial portion of the transactions and wrongs complained of in this Complaint occurred in this judicial district.

18.    This action is not a collusive one to confer jurisdiction upon the Court of the United States which would not otherwise have such jurisdiction.

## PARTIES

19.    Plaintiff at all times relevant hereto has been an EMC shareholder and is a resident of Englewood, Colorado.

20.    Defendant EMC is a Massachusetts Corporation that maintains its principal place of business at 176 South Street, Hopkinton Massachusetts 01748.  EMC is a recognized

leader in providing computer and information storage, management, protection, analysis and data security information for enterprises.  It is named as a defendant herein so that complete relief can be granted.  EMC securities are traded on the NASDAQ stock market under the ticker symbol "EMC."

21.    Defendant Dell is a Delaware Corporation that maintains its principal place of business at One Dell Way, Round Rock, Texas 78682.  In 2003, M. Dell and Silver Lake took Dell private.

22.    Defendant Silver Lake is a limited liability company with an office at 9 West 57th Street, 32nd Floor, New York, New York 10019.

23.    Defendant MSD is an SEC-registered investment adviser formed in 2009 by the principals of MSD Capital, L.P. ("MSD Capital"), which was established in 1998 to exclusively manage the capital of M. Dell and his family.

24.    Defendant Denali is a Delaware Corporation created for purpose of effecting the Proposed Transaction.

25.    Defendant Universal is a Delaware corporation created for purposes of effecting the Proposed Transaction, and direct wholly owned subsidiary of Denali.

26.    Defendant Tucci has been Chairman of the Board of Directors of EMC since January 2006 and has been Chief Executive Officer and a director since January 2001.  Tucci has been President of EMC since 2014, having previously served in that role from January 2000 to July 2012, and was previously also the Company's Chief Operating Officer.  Tucci also serves as the chairman of the board of VMware and is currently a director of Paychex, Inc.  Upon information and belief, defendant Tucci is a citizen of Massachusetts.

27.    Defendant Jose E. Almeida ("Almeida") has been a director of EMC since January 2015.  He was one of the directors appointed to the Board  by activist hedge fund Elliot Management.    Upon information and belief, defendant Almeida is a citizen of Massachusetts.

28.    Defendant Michael Brown ("Brown") has been a director of EMC since August 2005.  He is currently a director of VMware, Insperity, Inc., Thomas Weisel Partners Group, Inc., 360networks Corporation, and Stifel Financial Corp. Upon information and belief, defendant Brown is a citizen of Washington.

29.    Defendant Donald J. Carty ("Carty") has been a director of EMC since January 2015.  He served as Vice Chairman and Chief Financial Officer of Dell from January 2007 to June 2008.  He currently serves as the chairman of Virgin American Airlines, Inc. and as a director of Canadian National Railway Company, Talisman Energy, Inc., Sears, Roebuck and Co, and Porter Aviation Holdings, Inc.  He was one of the directors appointed to the Board by Elliot Management. Upon information and belief, defendant Carty is a citizen of Texas.

30.    Defendant Randolph L. Cowen ("Cowen") has been a director of EMC since January 2009.  Prior to his retirement, Cowen was employed by Goldman Sachs Group in a variety of executive roles for more than 25 years, serving at various times as co-chief administrative officer, Global Head of Technology and Operations, and chief information officer.  He is a member of the board of directors of NPowerNY Inc.  Upon information and belief, defendant Cowen is a citizen of New York.

31.    Defendant James S. DiStasio ("DiStasio") has been a director of EMC since March 2010.  From January 2003 until his retirement in January 2007, DiStasio served as Senior Vice Chairman and Americas Chief Operating Officer of Ernst & Young LLP.  In addition, he spent over 38 years at Ernst & Young in various management roles.  DiStasio is a currently a member of the Board of Trustees of Northeast Utilities.  Upon information and belief, defendant DiStasio is a citizen of Massachusetts.

32.    Defendant John R. Egan ("Egan") has been a director of EMC since May 1992.  Egan is the son of the Company's co-founder Richard Egan, and he has been a managing and general partner in Egan-Managed Capital.  For more than a decade, Egan served EMC in various executive positions, including as the executive vice president of operations and the executive vice president of international sales.  Egan is currently a director of VMware, NetScout Systems, Inc., Progress Software Corporation, and Verint Systems Inc Upon information and belief, defendant Egan is a citizen of Massachusetts.

33.    Defendant William D. Green ("Green") has been a director of EMC since July 2013 and the Lead Director since February 2015.  He is currently a director of Zudy and McGraw Hill Financial, Inc.  Upon information and belief, defendant Green is a citizen of Massachusetts.

34.    Defendant Edmund F. Kelly ("Kelly") has been a director of EMC since August 2007.  He is also a director of The Bank of New York Mellon Corporation, Liberty Financial Companies, Inc., Liberty Mutual Agency Corporation, and Liberty Insurance Limited.  Upon information and belief, defendant Kelly is a citizen of Massachusetts.

35.    Defendant Jami Miscik ("Miscik") has been a director of EMC since August 2012.    Defendant Miscik is currently the president and vice chairman of Kissinger Associates, Inc., an international consulting firm.    Upon information and belief, Defendant Miscik is a citizen of New York.

36.    Defendant Paul Segan ("Segan") has been a director of EMC since December 2007.    Sagan is a member of the National Security Telecommunications Advisory Committee and is a director of VMware, Datto Inc., L2 ltd, Propublica and Akamai.    Upon information and belief, Defendant Segan is a citizen of Massachusetts.

37.    Defendant Laura J. Sen ("Sen") has been a director of EMC since September 2015.    She is currently the CEO of BJ's Wholesale Club and director of rue21, Inc., the Federal Reserve Bank of Boston, Inc, and Massachusetts Mutual Life Insurance Company. Upon information and belief, Defendant Sen is a citizen of Massachusetts.

38.    Tucci, Almeida, Brown, Carty, Cowen, DiStasio, Egan, Green, Kelly, Miscik, Sagan and Sen are hereinafter referred to as the Individual Defendants.    Each of the Individual Defendants was a member of the Board at all pertinent times and participated in the decisions and conduct alleged herein.    By reason of their positions, each Individual Defendants had, and continues to have, an obligation to determine whether the Proposed Transaction is in the best interest of all of the Company's shareholders and maximizes shareholder value.

## SUBSTANTIVE ALLEGATIONS

### *Background*

39.    EMC is a leader in developing, delivering and supporting the information

technology.    EMC consists of a federation of businesses including EMC Information Infrastructure, VMware Virtual Infrastructure and Pivotal.

40.    EMC's information infrastructure business provides a foundation for organizations to store, manage, protect, analyze and secure ever-increasing quantities of information, while at the same time improving business agility, lowering cost, and enhancing competitive advantage.    EMC's information infrastructure business is comprised of three segments – Information Storage, Enterprise Content Division and RSA Information Security.

41.    EMC ranks 128 in the Fortune 500 and had reported revenues of $24.4 billion in 2014, the largest revenue year in EMC's 35-year history.

42.    EMC employs approximately 70,000 people worldwide.    The Company is represented by approximately 400 sales offices and scores of partners in 86 countries around the world.    It has the world's largest sales and service force focused on information infrastructure, and it works closely with a global network of technology, outsourcing, systems integration, service, and distribution partners.

43.    EMC has an 81% interest in VMware, a publicly traded company. VMware is the leader in virtualization infrastructure solutions utilized by organizations to help them transform the way they build, deliver and consume IT resources. VMware's virtualization infrastructure solutions, which include a suite of products and services designed to deliver a software-defined data center, run on industry-standard desktop computers and servers and support a wide range of operating system and application environments, as well as networking and storage infrastructures.

44.    EMC owns approximately 81% of VMware, with the remaining 19% of VMware shares traded on the New York Stock Exchange under the ticker symbol "VMW". At least one half of VMware's board consists of Board members of EMC, and Tucci effectively controls both boards, acting as the chief executive officer of EMC while acting as the Chairman of the Board of VMware.  Moreover, VMware's Chief Executive Officer, Pat Gelsinger ("Gelsinger"), reports directly to Tucci.  Currently VMware carries a market capitalization of approximately $30 billion.

45.    The Company is poised for future growth and success.

46.    On July 22, 2015, EMC issued a press release announcing its second quarter 2015 financial results.  The Company reported that GAAP revenue was up 2% year over year and non-GAAP revenue was up 3% (up 8% on a constant currency basis) year over year. EMC also reported that EMC Information Infrastructure revenue was up 1% year over year (up 6% on a constant currency basis), and Emerging Storage revenue was up 49% year over year – led by XtremIO, Isilon, and Software-Defined Storage.

47.    With respect to the financial results, Tucci, EMC Chairman and CEO, said:

> While pleased with many aspects of the second quarter, especially with the market acceptance and rapid growth of our newer products, we also saw customers become more conservative around refreshing their traditional infrastructures as they plan their IT transformations. We also saw ongoing geo-political factors in China and Russia. To capture more opportunity we have honed our growth strategy around four pillars: best-in class products and solutions that are, or will be, offered as a service; an expanded focus on cloud services; tighter coordination of our federated go-to-market approach; and a leadership team that is second to none. We are confident in our strategy in becoming the most trusted partner to customers embarking on digital transformation and hybrid cloud journeys, and we remain laser focused on enhancing shareholder value.

48.    Zane Rowe, EMC's Chief Financial Officer, stated:

My thanks to the entire team for their hard work and execution in the second quarter. We are seeing success in the growth areas of our portfolio, while our traditional storage category was impacted by customers focusing on their short-term purchasing needs as they develop their digital agendas. We continue to drive growth, cost efficiency and business transformation, as well as additional alignment across our businesses.

49.    Additionally, David Goulden, CEO of EMC Information Infrastructure, commented:

In an IT market that is changing rapidly, our new businesses are performing exceptionally well, with the Emerging Storage business now at nearly a $3 billion revenue run-rate, which we expect will grow more than 30% in 2015. We are focused on evolving our storage portfolio, delivering solutions, leading in high-growth areas and getting more aggressive on costs and are taking additional steps to manage the trends in our traditional storage business. Going forward, the favorable mix toward new applications and transformational spend will serve us well beyond 2015.

***The Inadequate Proposed Transaction***

50.    Despite the Company's prospects for future growth and success, the Board caused the Company to enter into the Merger Agreement, pursuant to which EMC will be acquired by Dell for inadequate consideration.

51.    Upon completion of the Proposed Transaction, stockholders of EMC will receive approximately $33.15 per share in cash and stock.  Pursuant to the Merger Agreement, EMC stockholders will receive: (i) $24.05 in cash, and (ii) a number of shares of common stock of a newly created entity ("Parent") designated as Class V Common Stock, equal to the quotient obtained by dividing (A) 222,966,450 by (B) the aggregate number of shares of Company common stock issued and outstanding immediately prior to the effective time, plus cash in lieu of any fractional shares.

52.    The aggregate number of shares of Class V Common Stock issued as Merger Consideration in the Proposed Transaction is intended to represent 65% of the Company's economic interest in the approximately 81% of the outstanding shares of VMware currently owned by the Company, reflecting approximately 53% of the total economic interest in the outstanding shares of VMware.  Upon completion of the Proposed Transaction, Parent, or Dell and the remaining Acquirers, will retain the remaining 28% of the total economic interest in the outstanding shares of VMware.

53.    As stated above, the Proposed Transaction fails to account for the downward pressure that issuance of such tracking stock will have and is having on VMware's share price, and fails to provide a mechanism for assuring Class members that they will in fact receive consideration worth $33.15 per share or adequate consideration for their EMC shares.

54.    In fact, since the announcement of the Proposed Transaction, the value of VMware shares have continued to slide.

55.    Moreover, and as state above, the tracking stock strips EMC of its voting and other rights with respect to VMware.

56.    Even aside from the issuance of tracking stock, the Merger Consideration is less than the consideration that could have been obtained in a break up of the Company. Indeed, according to an analyst at FBR & Company, "many EMC shareholders will likely argue breakup value is in the $35-38/share range and we strongly agree."[3]  As one analyst summed the Proposed Transaction:  "I think it's a great deal for Dell.  I think it's a terrible deal for shareholders, consumers and Boston."

---

[3] See http://fortune.com/2015/10/12/analysts-dell-emc-acquisition/

57. According to other analyses, the Merger Consideration offers a much lower multiple of EBITDA than that offered by precedent transactions including acquisitions made by EMC.

58. That analyses demonstrates that the average enterprise value to trailing twelve month revenue and enterprise value to trailing twelve month EBITDA for precedent transactions is 6.2 and 82.1, respectively, whereas the Proposed Transaction offers significantly far lower multiples:

**Precedent Transactions**

|  | EV / T12 Revenue | EV / T12 EBITDA |
|---|---|---|
| EMC-Dell | 2.6 | 11.6 |
| BMC-Consortium | 3.0 | 9.6 |
| Fusion-io-SanDisk | 2.7 | |
| Isilon-EMC | 12.7 | 167.0 |
| Data Domain-EMC | 6.5 | 69.6 |
| Averages | 6.2 | 82.1 |

Market Realist

Source: Market Realist

59. The above analysis demonstrates that the Merger Consideration is inadequate.

***The Board is Conflicted and the Transaction is Structured to benefit Dell and Tucci***

60. EMC board members including Tucci, Brown, Egan and Sagan constitute half of VMware board, and therefore are conflicted because as EMC board members they have a fiduciary duty to maximize value and return for EMC shareholders and act in the best interest of the Company while having a conflicting duty to maximize value to VMware and its

minority shareholders—which could only have been reconciled here through a purchase of EMC's interest in VMware for maximum value.  Instead, the tracking stock, the amount of which will not be adjusted for a decline in the value of VMware shares, will also result in the dilution of VMware shareholders, and a decline in its stock price. Issuance of the tracking stock neither provides EMC shareholders with sufficient VMware shares or consideration for their VMware shares, not does it fair to VMware shareholders.

61.    Given their conflicts, Tucci, Brown, Egan and Sagan could not negotiate a transaction which provided EMC shareholders with sufficient VMware tracking shares, without diluting VMware minority shareholders and causing significant pressure on VMware's share price.

62.    Further, the Individual Defendants have agreed to provide EMC shareholders with risky tracking stock, rather than insisting that Dell buy out for EMC's entire position in VMware for maximum value, because Dell is unable to raise sufficient cash to effect an all cash deal. By allowing Dell to purchase the Company and use tracking stock, however, Tucci was able to preserve his "federation" of entities under the EMC umbrella.

63.    To the detriment of the Company's stockholders, Tucci has refused to break up the Company's business to unlock value for the Company's stockholders.  As one analyst and former EMC employee put it:  "[Tucci] built EMC into what it is.  This is his baby, and he didn't want to see it get ripped apart."  Another analyst stated that Tucci viewed EMC "almost as one of his kids."

64.    On October 8, 2014, Elliott Managemen, an activist EMC stockholder, wrote a letter to the Board stating that the Company's structure was "obscur[ing] enormous value"

for stockholders.  Elliott advocated for the sale of VMware from EMC, followed by the sale of the rest of the Company.  To thwart Elliott's efforts to break up the Company to unlock stockholder value, Tucci caused the Company to enter into a standstill agreement, whereby Elliott was permitted to appoint Ameida and Carty to the Board.

65.    Tucci also refused to retire as planned.  As early as 2009, Tucci stated that he planned to retire in 2012.  In January 2012, Tucci stated that he would retire in 2013, but in September 2012, Tucci stated that he would retire in February 2015.  Again, in January 2015, Tucci backtracked and refused to retire, ostensibly because he knew a sale of the Company was inevitable and he would be guaranteed change in control benefits, which he otherwise could not realize if he retired.

66.    As summed by one analyst at FBR Capital Markets: "I don't think [Tucci] wanted to go out in a bad way by being forced into a breakup.  This way, [Tucci was] able to put a bow around his career."

***The Proposed Transaction is the Result of Conflicts of Interest***

67.    As a result of the Proposed Transaction, Tucci will receive approximately $27 million in compensation, as opposed to the approximately $123,636 that Tucci would have received by retiring as he repeatedly promised he would do.  Aside from pecuniary gains, Tucci received another benefit as a result of the Proposed Transaction: he was able to keep his legacy and pride intact by preventing the breakup of the Company under his watch.  Now, Dell will be able to reap the benefits of a breakup of EMC, and not EMC's public stockholders.

68.    Further, the Company's investment banker in connection with the Proposed Transaction, Evercore Partners, has recently earned substantial fees from Dell in connection with Dell's recent going-private transaction.  Another advisor to the Board, Morgan Stanley, has acted as financier to Dell in the past, financing billions of dollars in transactions involving Dell.

69.    As a result of these conflicts of interest, the sale of the Company was tilted in favor of Dell to the detriment of the Company's public stockholders.

***The Merger Agreement Contains Deal Protection Provisions***

70.    To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Dell and are calculated to unreasonably dissuade potential suitors from making competing offers.

71.    For example, despite a limited go shop period, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 4.02 of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 4.02(b) of the Merger Agreement states, in relevant part:

> (b) Except as expressly permitted under Section 4.02(a), from the date of this Agreement the Company agrees that neither it nor any of its Subsidiaries shall, and the Company shall cause its and its Subsidiaries' Representatives not to, directly or indirectly through another person, (i) solicit, initiate or knowingly encourage, or knowingly facilitate or knowingly induce, the making of any Acquisition Proposal, or the making of any inquiry, offer or proposal that would reasonably be expected to lead to, any Acquisition

Proposal, (ii) enter into, facilitate, continue or otherwise participate or engage in any discussions or negotiations regarding, or furnish to any person any information or data or afford access to the business, directors, officers, employees, properties, facilities, assets, contracts, books or records of the Company or any of its Subsidiaries to any person in connection with any Acquisition Proposal, (iii) enter into any agreement relating to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement prior to the No-Shop Period Start Date or in accordance with this Section 4.02(b)), (iv) waive, terminate, modify or fail to enforce any provision of any "standstill" or similar obligation of any person (other than Parent) with respect to the Company or any of its Subsidiaries (unless the Company concludes in good faith, after consultation with its outside legal advisors, that the failure to so waive, terminate, modify or fail to enforce would be inconsistent with its fiduciary duties under applicable Law), (v) take any action to make the provisions of any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation, or any restrictive provision of any applicable anti-takeover provision in the Company Articles or Company Bylaws, inapplicable to any transactions contemplated by any Acquisition Proposal or (vi) authorize any of, or commit or agree to do any of the foregoing. . . .

72. Further, pursuant to Section 4.02(e) of the Merger Agreement, the Company must advise Dell, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal. Section 4.02(e) of the Merger Agreement states:

(e) In addition to the obligations of the Company set forth in clauses (a), (b), (c) and (d) of this Section 4.02, after the No-Shop Period Start Date the Company shall as promptly as practicable (and in any event within 24 hours after receipt) notify Parent orally and in writing of any Acquisition Proposal (other than an Acquisition Proposal received prior to the No-Shop Period Start Date which was withdrawn prior to the No-Shop Period Start Date), such notice to include the identity of the person making such Acquisition Proposal and a copy of such Acquisition Proposal, including draft agreements or term sheets, financing commitments and other related documents submitted in connection therewith (or, where no such copy is available, a reasonably detailed written description of such Acquisition Proposal), including any material modifications thereto. Following the No-Shop Period Start Date, the Company shall (x) keep Parent reasonably informed in all material respects of the status and details (including any change to the terms thereof) of any

Acquisition Proposal and (y) provide to Parent as soon as reasonably practicable after receipt or delivery thereof copies of all correspondence and other written material sent or provided to the Company or any of its Subsidiaries from any person that describes any of the terms or conditions of any Acquisition Proposal. The Company shall not, and shall cause the Company's Subsidiaries not to, enter into any Contract with any person subsequent to the date of this Agreement that prohibits the Company from providing such information or the information contemplated by the last sentence of Section 4.02(a) to Parent or otherwise limits or impairs the Company's or its Subsidiaries' or Representatives' ability to comply with their respective obligations in this Section 4.02.

73.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Dell a "matching right" with respect to any "Superior Proposal" made to the Company.   Section 4.02(d) of the Merger Agreement provides, in relevant part:

(d) Notwithstanding anything to the contrary contained herein, the Board of Directors of the Company shall not be entitled to exercise its right to make a Change of Recommendation and the Company shall not be entitled to terminate this Agreement under Section 7.01(d)(ii) unless (i) the Company has complied in all material respects with this Section 4.02, (ii) the Company promptly notifies Parent, in writing, at least five (5) Business Days before taking that action, of its intention to take such action (which notification shall specify the details of the event giving rise to the Change of Recommendation and, if applicable, the identity of the person making an Acquisition Proposal that was determined to constitute a Superior Proposal and the material terms thereof, together with copies of any written offer or proposal, proposed definitive agreement, proposed or committed financing documentation and any other related documents in respect of such Acquisition Proposal), (iii) during such five (5)-Business Day period, if requested by Parent, the Company and its Representatives shall meet and engage in good faith negotiations with Parent and its Representatives to amend the terms and conditions of this Agreement in such a manner as would permit the Board of Directors of the Company or the Company to not take such actions, and (iv) following the end of such five (5)-Business Day period, the Board of Directors of the Company shall have determined in good faith, after consultation with its outside legal advisors, and taking into account any

changes to the terms of this Agreement proposed by Parent following any notice provided pursuant to this Section 4.02(d) or otherwise, that the failure to take such action would continue to be inconsistent with its fiduciary duties under applicable Law and, in the case of a Change of Recommendation in response to an Acquisition Proposal or termination under Section 7.01(d)(ii), after consultation with a financial advisor of nationally recognized reputation, that the Acquisition Proposal giving rise to such notice continues to constitute a Superior Proposal; provided, however, that if (A) the Company receives an Acquisition Proposal pursuant to which the Board of Directors of the Company determines in good faith, after consultation with its outside legal advisors and a financial advisor of nationally recognized reputation, that, if consummated, would result in the holders of Company Common Stock receiving consideration valued at 115% or more of the Merger Consideration (measured as the cash or fair market value of the applicable consideration), and (B) the Board of Directors of the Company determines that such Acquisition Proposal constitutes a Superior Proposal, then the requirements of this Section 4.02(d) shall not apply to such Acquisition Proposal, any amendment thereof or any new Acquisition Proposal from such person meeting the requirements set forth in clause (A) of this proviso; provided, further, that any amendment to the financial terms or other material terms or conditions (including the provision of financing) of the Acquisition Proposal which was determined to constitute a Superior Proposal (other than an Acquisition Proposal described in clause (A) of the foregoing proviso) shall require a new written notification from the Company and an additional two (2)-Business Day period that (other than as to the five (5) Business Day time periods set forth herein) satisfies this Section 4.02(d).

74.     Further locking up control of the Company in favor of Dell is Section 7.03 of the Merger Agreement, which contains a provision for a two-tier "Company Termination Fee."  If the Merger Agreement is terminated after the conclusion of the go-shop period, the Company must pay Dell *$2.5 billion*.  If the Merger Agreement is terminated prior to the conclusion of the go-shop period, the Company must pay Dell $2 billion.  Further, the Company may be required to pay Dell up to $50 million in expenses if the Merger Agreement is terminated.

75.    By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

76.    The consideration to be paid to Plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

77.    Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

78.    As a result, Defendants have breached their fiduciary duties that they owe to the Company's public stockholders because the stockholders will not receive adequate or fair value for their EMC common stock in the Proposed Transaction.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

79.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) on behalf of a Class of all public shareholders of EMC, excluding Defendants, their subsidiaries, affiliates, heirs, assigns, agents or any entity related to any Defendant (the "Class").

80.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through discovery.  According to EMC's second quarter 2015 10-Q, as of June 30, 2015, there are approximately 1,924,726,357 shares of EMC common stock outstanding.

81.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

a.      whether the Individual Defendants have breached their fiduciary duties to maximize value, and their duties of undivided loyalty, independence or due care with respect to Plaintiffs and the other members of the Class in connection with the Proposed Transaction;

b.      whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

c.      whether the Individual Defendants have breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, candor and fair dealing;

d.      whether the Merger Consideration is inadequate and whether the Merger was the result of a conflicted and flawed process; and

e.      whether Plaintiff and the other members of the Class would be irreparably harmed if the Proposed Transaction is not enjoined.

82.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

83.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

84.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

85.    The Individual Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

86.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiffs and the other public shareholders of EMC and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

87.    Where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break-up of the

corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.    To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

      a.      adversely affects the value provided to the corporation's shareholders;

      b.      favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

      c.      adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

      d.      will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

88.    In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

      a.      participating in any transaction where the Individual Defendants' loyalties are divided;

      b.      participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

      c.      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

89.     The Individual Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest.

90.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated the fiduciary duties owed to Plaintiffs and the other public shareholders of EMC, including their duties of loyalty, good faith, candor, due care and independence owed to the Plaintiff and other public shareholders of EMC.

## COUNT I

### Breach of Fiduciary Duties (Against the Individual Defendants)

91.     Plaintiff repeats and realleges each allegation as if set forth fully herein.

92.     The Individual Defendants have violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of EMC and have acted to put their personal interests ahead of the interests of EMC's shareholders.

93.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in EMC.

94. The Individual Defendants have violated their fiduciary duties by entering into a transaction with Dell without regard to the fairness of the transaction to EMC's shareholders.

95. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of EMC because, among other reasons:

    a. they failed to properly value EMC; and

    b. they ignored or did not protect against the conflicts of interest resulting from certain of the directors' own connections in relation to the Proposed Transaction. Because the Individual Defendants dominate and control the business and corporate affairs of EMC, and are in possession of private corporate information concerning EMC's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of EMC which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

96. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

97.     As a result of the actions of the Individual Defendants, Plaintiff and the Class have been and will be irreparably harmed in that they have not and will not receive their fair portion of the value of EMC's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

98.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction which will exclude the Class from its fair share of EMC's valuable assets and businesses, and/or benefit Defendants in the unfair manner complained of herein, all to the irreparable harm of the Class.

99.     As stated above, Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## COUNT II

### For Aiding and Abetting Against
### (Against Dell, Silver Lake, Denali, Universal, and MSD)

100.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

101.     Dell, Silver Lake, Denali, Universal, and MSD, knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred.  In connection with discussion regarding the Proposed Transaction, Dell, Silver Lake, Denali, Universal, and MSD obtained sensitive, non-public information concerning EMC, and thus had unfair

advantages that are enabling it to pursue the Proposed Transaction which offers unfair and inadequate consideration.

102.    As a result of this conduct, Plaintiff and other member of the Class have been and will be damaged in that they have and will be prevented from obtaining fair consideration for their EMC shares.

103.    Plaintiff and other members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as the class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.    Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of the Individual Defendants and is  therefore unlawful and unenforceable;

C.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Individual Defendants take steps to maximize shareholder value;

D.    Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

      F.      Granting such other and further equitable relief as this Court may deem just and proper.

Dated:  October 30, 2015            By his attorneys,

                             */s/ Edward F. Haber*_____
                             Edward F. Haber (BBO# 215620)
                             Adam M. Stewart (BBO#661090)
                             SHAPIRO HABER & URMY LLP
                             Seaport East
                             Two Seaport Lane
                             Boston, MA 02210
                             (617) 439-3939
                             ehaber@shulaw.com
                             astewart@shulaw.com

                             Lynda J.  Grant, Esq.
                             THE GRANT LAW FIRM, PLLC
                             521 Fifth Avenue, 17th Floor
                             New York, NY 10175
                             Tel:  (212) 292-4441
                             lgrant@grantfirm.com

                             *Attorneys for Plaintiff*